RECEIVED
IN LAKE CHARLES, LA

MAY 27 2009

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA



# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAKE CHARLES DIVISION

| | | |
|---|---|---|
| LINDA VEZINA ET AL. | : | DOCKET NO. 2:07 CV 0904 |
| VS. | : | JUDGE MINALDI |
| UNITED STATES OF AMERICA | : | MAGISTRATE JUDGE METHVIN |

## OPINION

The plaintiffs, Linda Vezina and Kayla Vezina, brought this suit pursuant to the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. § 2671, *et seq.*, against the United States of America. This Court presided over a bench trial commencing on April 13, 2009.

## PROCEDURAL HISTORY

On March 10, 2004, plaintiff Linda Vezina underwent diagnostic laparoscopy by James T. Austin, Jr. MD, for chronic abdominal pain and pelvic adhesions.[1] Ms. Vezina alleges, individually and as tutrix of her daughter Kayla Vezina,[2] that Dr. Austin's medical negligence during that procedure resulted in complications that included lengthy hospitalizations, multiple surgeries, and extensive medical care.[3] Ms. Vezina filed suit with the Louisiana Compensation Fund on March 10,

---

[1] Pl.'s Ex. C [doc. 9-1] (Petition for Damages, filed in 14th Judicial District Court on May 17, 2005).

[2] Kayla Vezina is no longer a minor, and accordingly, at the close of trial, this Court orally granted a motion to convert the claim of Terry Vezina on behalf of his minor child Kayla Vezina to a claim brought by Kayla Vezina individually [doc. 63]. The Court also granted Terry Vezina's voluntary motion to dismiss his claim. *Id.*

[3] Pl.'s Ex. C [doc. 9] ¶¶ 9-19.

1

2005, under the Louisiana Medical Malpractice Act.[4] On March 24, 2005, Ms. Veniza discovered that Dr. Austin is not a qualified provider.[5] Ms. Vezina filed suit in the Fourteenth Judicial District Court of Louisiana on May 17, 2005.[6] On November 17, 2005, Ms. Vezina amended her original claim to add Southwest Louisiana Center for Health Services as an additional defendant.[7]

On January 3, 2006, Ms. Vezina added the Bayou Comprehensive Health Foundation as an additional defendant.[8] On March 29, 2006, the United States filed a Notice of Removal due to Dr. Austin's status as a federal employee.[9] On March 30, 2006, Ms. Vezina filed a claim pursuant to the Federal Tort Claims Act ("FTCA").[10] On April 4, 2006, the United States Department of Health and Human Services acknowledged receipt of Ms. Vezina's claim.[11]

On April 28, 2006, the United States filed a Motion to Dismiss for Failure to Exhaust Administrative Remedies, which was granted by this court on June 30, 2006.[12] On April 30, 2007, the United States formally denied Ms. Vezina's claim arising under the FTCA, which constituted

---

[4] *Id.* ¶ 16.

[5] *Id.* ¶ 17.

[6] *Id.*

[7] Pl.'s Ex. G [doc. 9].

[8] Pl.'s Ex. I [doc. 9].

[9] Pl.'s Ex. L [doc. 9].

[10] Pl.'s Ex. M [doc. 9].

[11] Pl.'s Ex. N [doc. 9].

[12] Pl.'s Exs. O-P [doc. 9].

the final determination on Ms. Vezina's claim.[13]  The denial letter stated that Ms. Vezina had six

months to file in the appropriate federal court.[14]  On May 30, 2007, Ms. Vezina filed the present suit.

On July 23, 2007, the United States filed a Motion to Dismiss based on lack of subject matter

jurisdiction for Ms. Vezina's failure to exhaust her administrative remedies under the FTCA.[15]  On

September 24, 2007, this Court denied the Motion to Dismiss.[16]

## STIPULATIONS

The State of Louisiana, Department of Health and Hospitals (hereinafter "DHH") for the

Medicaid Program, as an intervenor defendant, entered the following stipulation[17] should Ms. Vezina

receive any recovery:

> In accordance with the provision of Louisiana Revised Statute
> 46:446, et seq., and Title XIX of the Social Security Act, codified in
> 42 U.S.C.1396, the State of Louisiana, Department of Health and
> Hospitals, for the Medicaid Program, (Medicaid) without any further
> appearance, is entitled to recover the itemized payments made by
> Medicaid on behalf of Linda Vezina as a result of her accident-related
> injuries out of any recovery made by plaintiff herein from defendant
> herein. **The current balance due Medicaid is $44,073.12.**

## FINDINGS OF FACTS

This Court hereby enters the following findings of fact and conclusions of law.  To the extent

that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such, and to the

---

[13] Pl.'s Ex. R [doc. 9].

[14] *Id.*

[15] Def.'s Mot. to Dismiss [doc. 4].

[16] Mem. Ruling (Sept. 24, 2007) [doc. 12].

[17] Stipulation (April 9, 2009) [doc. 61].

extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

### 1.) Timeline of Events

In October 2003, Linda Vezina went to the Southwest Clinic (hereinafter "the Clinic") complaining of abdominal pain for more than one year, back pain, and painful intercourse on the right side.[18] She visited the Clinic on March 3, 2004, complaining of lower abdominal and pelvic pain.[19] She was seen by Dr. Austin the following day, March 4, 2004, for her annual exam with a complaint of right side pain.[20] During that appointment, he made notes that her prior surgical history included a hysterectomy.[21] Dr. Austin noted that during his pelvic examination she was tender in the right lower quadrant but did not feel any masses.[22] He noted that she likely had adhesive disease with no recommendations for treatment.[23] Ms. Vezina signed a consent form for a laparoscopy on March 9, 2004.[24]

Prior to the March 10, 2004 surgery, Ms. Vezina's surgical history included: an appendectomy, tubal ligation, an abdominal hysterectomy, and a bilateral salpingoopharectomy (removing both tubes and ovaries), which resulted in complications of bleeding.[25] The only surgeries

---

[18] R. 000081.

[19] R. 000076.

[20] R. 000073.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] R. 000349.

[25] Piver Dep. 27:4-28:4.

4

that were present in the Clinic notes prior to the March 10 surgery were the abdominal hysterectomy, and bilateral salpingoopharectomy.

On March 10, 2004, Ms. Vezina was admitted to Women and Children's Hospital for a diagnostic laparoscopy with lysis of the adhesions.[26] In his surgical note written on March 10, Dr. Austin stated he "pulled apart with blunt and sharp dissection."[27] During surgery, Dr. Austin did not convert to either a laparotomy or an open laparoscopy.[28] His surgical note also states that Ms. Vezina had an estimated blood loss of 500 milliliters during surgery.[29] The surgical report does not mention any problems during the surgery.

On March 16, Dr. Austin dictated an operative report, which was transcribed on March 17.[30] This report states that he had difficulty inserting the laparoscopic trocar.[31] The report also states that he used blunt dissection to pull apart adhesions, which resulted in a lot of bleeding.[32] He found a large band of bowel attached to the anterior abdominal wall.[33] He also stated that he constantly rinsed

---

[26] R. 000382.

[27] *Id.* "Blunt dissection is cutting something with either a sponge or a blunt instrument. Sharp dissection is cutting something either with an electrical cautery, electrical current or scalpel or a scissors." Piver Dep. 31:15-19.

[28] R. 000382.

[29] *Id.*

[30] R. 000367.

[31] *Id.*

[32] *Id.* The report does not mention sharp dissection.

[33] *Id.* This finding was not stated in his surgical progress note.

the abdomen with saline solution and did not observe any areas of perforation.[34] His operative report states he used about two liters throughout the procedure.[35] Dr. Austin wrote that because of problems with the bowel, he kept Ms. Vezina overnight for observation, and that she went to the recovery room in "guarded" condition.[36] Following her stay in the recovery room, Dr. Austin sent her to the floor for overnight observation.[37] Her hospital chart does not articulate a reason for keeping her overnight.

On March 10, 2004 at 3:15 p.m., Ms. Vezina's HGB count was 9.8 and her HCT count was 29.2.[38] At 5:15 p.m., her HGB count was 10.0 and her HCT count was 30.0.[39] On March 11 at 7:34 a.m., her HGB count was 8.7 and her HCT count was 25.6.[40] Her blood pressure was approximately 105/66 at the time of discharge.[41] In the twelve hours prior to discharge, Ms. Vezina's pulse rate remained in the 110s.[42]

Also in the record is a typed letter from Dr. Austin, in which Dr. Austin stated "during the surgery it was felt that there may have been a bowel perforation. . . careful examination during the

---

[34] *Id.*

[35] R. 000367.

[36] *Id.*

[37] *Id.*

[38] R. 000390. The HGB and HCT counts are collectively referred to as "H and H."

[39] *Id.*

[40] *Id.*

[41] Piver Dep. 75:13-15.

[42] *Id.* 80:1-81:7.

surgery could not identify one . . . she was kept in the hospital overnight for observation."[43] He further stated that her blood count remained stable and her vital signs were normal, so he discharged her.[44]

Following discharge, Ms. Vezina testified at trial that her pain level increased so much that she called Dr. Austin. She testified that he instructed her to increase her pain medicine and take Mylanta. He did not instruct her to seek further medical attention.

Ms. Vezina was admitted to Women's and Children's Hospital on March 13, 2004. Ms. Vezina testified that she became delirious, which prompted her ex-husband to take her back to the hospital. She was admitted for perforation of her colon, which resulted in her becoming septic and developing peritonitis. Ms. Vezina does not remember going to the hospital, and the next thing she remembered was eight days later, when she woke up in intensive care.

On March 14, 2004, Ms. Vezina underwent surgery performed by Drs. O'Donnell and Guidry, in which they performed an exploratory laparotomy, evacuation of intra-abdominal hematoma and fecal contamination with extensive irrigation, sigmoid colectomy, and lysis of adhesions.[45] The operative report notes that approximately 750 cc of "old-appearing blood" was evacuated.[46] This report was dictated on March 14 and transcribed on March 15.[47] Between these surgeries, Dr. O'Donnell removed 19 centimeters of sigmoid colon and 12.5 centimeters of

---

[43] Piver Dep. Ex. C.

[44] *Id.*

[45] R 000060-000061.

[46] *Id.*

[47] *Id.*

descending colon.[48]

On March 16, 2004, Ms. Vezina had another surgery performed by Drs. O'Donnell and Guidry, in which they performed a second-look exploratory laparotomy, intra-abdominal irrigation, immobilization of the splenic flexure, colocolostomy, loop ileostomy, and application of wound vac.[49] This report was dictated on March 16 and transcribed on March 16.[50]

On April 12, 2004, Dr. O'Donnell performed surgery to remove the colostomy bag. On November 19, 2004, Dr. O'Donnell performed surgery to repair hernias. Dr. O'Donnell performed a total of four surgeries as a result of complications from the March 10, 2004 diagnostic laparoscopy performed by Dr. Austin.

### 2.) Expert Testimony

### A.) Julius Piver, M.D.

Dr. Julius Piver testified via deposition as the plaintiffs' expert witness. It was Dr. Piver's opinion that Dr. Austin breached several standards of care, which this Court shall consider chronologically as divided by the surgery, post-operative hospital care, and post-discharge care.

### 1.) The Surgery

Dr. Piver stated that Dr. Austin was negligent during the March 10, 2004 surgery when he: persisted with a closed laparoscopy when the extensive adhesions on the abdominal wall and the bowel were visualized; failed to convert to an open procedure or laparotomy once the extent of the adhesions were recognized; used blunt dissection during the laparoscopy; and failed to test for bowel

---

[48] R. 000017, 000020.

[49] R 000056-000059.

[50] *Id.*

8

perforation at the end of the surgery.

Ms. Vezina had four previous abdominal surgeries, one of which resulted in blood loss in the pelvis. Dr. Piver stated that these prior surgeries not only made Ms. Vezina more susceptible to pelvic adhesions, but also more susceptible to trauma to organs during another laparoscopic procedure.[51] Given her history, Dr. Piver stated that the medical literature advises a doctor to perform either a laparotomy, which is an open surgical procedure, or an open laparoscopy "in which you make an incision in the fascia."[52] He testified that either of these procedures reduces the risk of a bowel injury when the adhesions are attached to the anterior abdominal wall.[53]

Dr. Piver also stated that pulling apart with blunt and sharp dissection is not prudent because of the risk of tearing whatever the adhesion is adherent to, and because of Ms. Vezina's significant adhesions.[54] Once Dr. Austin found significant adhesions, Dr. Piver states he should have converted to an open procedure or an exploratory laparotomy.[55] Dr. Piver also concluded that 500 ccs of blood loss "is considerably greater–than I have ever experienced."[56]

Once Dr. Austin encountered the large band of bowel attached to the anterior abdominal wall, Dr. Piver testified that he should have removed all of the gas used in the beginning of the procedure to expand the abdominal wall, injected between fifteen and twenty liters of saline to wash out the

---

[51] *Id.* 29:16-29:7.

[52] *Id.* 32:10-13.

[53] *Id.* 32:19-22-33:1.

[54] *Id.* 33:5-21.

[55] *Id.* 33:22-34:4.

[56] *Id.* 35:3-6.

pelvis, and check for blood.[57] Dr. Austin's notes indicate he only used two liters of saline, which Dr. Piver believed to be insufficient.[58] Dr. Piver also said that if Dr. Austin was concerned about a perforation, as indicated in his transcribed operative note, he should have brought in a consultation, and if one was not available, perform a laparotomy.[59] Dr. Piver also stated that identifying a bowel perforation at the time of surgery permits repair in a timely fashion and minimizes any fecal contamination.[60]

### 2.) Post-Operative Hospital Care

Following the surgery, Dr. Piver opined that Dr. Austin breached several standards of care, including: failing to appreciate the significance of Ms. Vezina's "guarded" condition; failing to seek a surgical consult prior to discharge; and failing to see Ms. Vezina or view the chart to obtain necessary information.

Dr. Piver stated that Dr. Austin failed to conform to the applicable standard of care when he did not dictate his surgical notes until six days after the surgery. In the absence of a complete surgical note, a comprehensive operative progress note may be entered into the medical record immediately after surgery to make available pertinent information for any person who is caring for the patient.[61] Although Dr. Austin wrote a chart progress note, Dr. Piver stated it "certainly was not"

---

[57] *Id.* 46:2-12.

[58] *Id.* 46:9-12.

[59] *Id.* 49:3-7.

[60] *Id.* 54:11-14.

[61] *Id.* 39:1-19.

a comprehensive progress note.[62]

Moreover, Dr. Piver testified that pain following laparoscopy should gradually diminish and be gone between four and six hours after the procedure.[63] He further stated that undiminished or increased pain is an indication that "something has[] happened or is happening to this particular patient that requires investigating."[64] He also stated that Ms. Vezina's H and H tests indicated she was losing blood, and there was no other explanation for the continuing decline of her H and H levels.[65] Moreover, Dr. Piver concluded her blood pressure was low and her pulse was high.[66] All of these factors, especially taken together, indicate that something was wrong with Ms. Vezina.

Dr. Piver also believed that Dr. Austin breached his duty by failing to examine Ms. Vezina prior to discharge.[67] There is no indication in the notes that Dr. Austin examined Ms. Vezina, as his discharge notes merely state "discharge."[68] The standard of care required Dr. Austin to examine her abdomen for rebound tenderness, perhaps order an X-ray, and call in a consultation, and failure to perform further workup or have a consultation prior to discharging Ms. Vezina is a breach of the standard of care.[69]

---

[62] *Id.* 40:2-4.

[63] *Id.* 56:13-15.

[64] *Id.* 56:16-21.

[65] *Id.* 68:10-17.

[66] *Id.* 76:1-5; 81:2-7.

[67] *Id.* 82:5-8.

[68] *Id.*

[69] *Id.* 85:7-85:17.

### 3.) Post-Discharge Phone Call

Finally, Dr. Piver stated that Dr. Austin breached the duty of care during the phone call forty-eight hours after her surgery complaining of severe abdominal pain and bleeding by failing to instruct Ms. Vezina to seek medical attention. Ms. Vezina testified at trial that she called Dr. Austin complaining of pain, and he suggested that she take Mylanta for the gas pains and some more pain pills. Dr. Piver stated that pain after a laparoscopic procedure should be gone within forty-eight hours, and the fact that it was not indicates a problem that requires examination.[70]

Dr. Piver testified that, in his professional opinion and based on medical probability, the breach of one or more of these standards of care resulted in damage to Ms. Vezina.[71]

Having considered Dr. Piver's deposition testimony in its entirety, this Court finds his expert opinions to be credible.

### B.) James T. Austin Jr., M.D.

In his March 16, 2004 operative report, Dr. Austin states he only used blunt dissection and does not mention sharp dissection.[72] The operative report also states that the adhesions were torn apart.[73] While testifying at trial on April 13 and 14, 2009, Dr. Austin stated that he used blunt instruments as well as sharp dissection with scissors.

The dictated March 16, 2004 report states that Ms. Vezina was in "guarded" condition, and that she was being kept overnight for observation; however, the handwritten note written the day of

---

[70] *Id.* 87:20-88:2.

[71] *Id.* 23:5-9.

[72] R. 000046.

[73] *Id.*

surgery does not mention either of these items. On April 14, 2009, Dr. Austin testified twice that he did not keep Ms. Vezina overnight due to concerns that her bowel was perforated. In the record, however, is a typed letter from Dr. Austin, in which Dr. Austin stated "during the surgery it was felt that there may have been a bowel perforation. . . careful examination during the surgery could not identify one . . . she was kept in the hospital overnight for observation."[74] Furthermore, during his May 19 deposition, Dr. Austin testified that he kept Ms. Vezina overnight because he was concerned about problems with her bowel.

In deposition, Dr. Austin stated that a patient's pulse should be no more than 100 the day after this type of surgery. Ms. Vezina's charts demonstrate that on March 11, 2004, her pulse was elevated to 115, 119, and 117 at midnight, 4 a.m., and 8 a.m., respectively.[75] Her pulse was 117 at the time of discharge.[76] At trial, Dr. Austin stated that an acceptable pulse rate depends on the individual patient. He also admitted that if he had realized that Ms. Vezina's pulse was 117 at discharge, it would have made him more concerned and he may have performed additional tests. Dr. Austin testified on April 13 that sepsis usually develops in two days.

Because of the numerous inconsistencies between his handwritten progress report, typed operative report, statements regarding Ms. Vezina's medical records, deposition, and live testimony, this Court does not find Dr. Austin to be credible.

### C.) R. Joseph Fernandez, M.D.

The Government's expert witness, Dr. Fernandez, testified on April 14. When asked at trial

---

[74] Piver Dep. Ex. C.

[75] R. 000396.

[76] R. 000413.

how long it takes for sepsis to develop, Dr. Fernandez stated that "it generally would not occur in less than 24 hours." During his deposition, Dr. Fernandez said "You would not see it within 24 to 48 hours necessarily, more likely 72 hours." Ms. Vezina's attorney noted that 72 hours elapsed from March 11, when she was discharged, and March 14, when Dr. O'Donnell diagnosed sepsis. When confronted with that timeline, Dr. Fernandez would not state that it was more likely than not that Ms. Vezina's sepsis began on March 11, the date of discharge, despite his conflicting deposition testimony. Given this among other discrepancies between his deposition and his testimony, this Court does not find that Dr. Fernandez is credible.

### D.) Dr. David Buttross

Dr. Buttross testified on April 14, 2009. Dr. Buttross began seeing Ms. Vezina in August 2008 when she was hospitalized on a voluntary "72-hour admit" on referral from Dr. Dilks because she was having suicidal thoughts. On her admittance forms, Ms. Vezina stated that she had been depressed since her surgery because she does not care for her appearance, and she has stress factors that include diarrhea and vomiting. Ms. Vezina was diagnosed with bipolar disorder and social anxiety. He testified that although the surgery did not cause her bipolar disorder and anxiety, the 2004 surgery aggravated both conditions. He stated that, despite all of her other factors, the surgery is the "main" stressor in Ms. Vezina's life, and has made her more prone to have the depressive episodes of her bipolar disorder, as well as social anxiety.

Dr. Buttross has treated Ms. Vezina through March 2009, and has "most definitely" made progress. He stated that her bipolar disorder is stable. His treatment plan for her future care includes prescription medication, a monthly visit with him, labwork to monitor how her body is processing the medication, and twice monthly psychotherapy.

### F.) Dr. Lawrence Dilks

Dr. Dilks is a neuropsychologist who first saw Ms. Vezina on August 21, 2008.[77] After she expressed suicidal tendencies, he admitted her to St. Patrick's Hospital in the care of Dr. Buttross.[78] Ms. Vezina was ultimately diagnosed with bipolar disorder.[79] Although Ms. Vezina discussed her abdominal scarring, diarrhea, and gas with Dr. Dilks,[80] their sessions focused on cognitive behavior therapy for her depression, anxiety, and bipolar because Blue Cross Blue Shield had only authorized him to treat and stabilize those conditions, and not explore the root of those conditions.[81] Dr. Dilks also testified that bipolar is generally caused by a genetic predisposition.[82] He also stated that the abdominal surgeries and resulting complications are "pieces of a puzzle" of her problem.[83] He also stated that he thinks it is "highly improbable" that her surgeries and subsequent complications are connected to her hypomanic episode, given the four years that passed between the first surgery and the episode in 2008.[84] He concluded by restating that Ms. Vezina has bipolar disorder, which she demonstrated before her surgery, but that the surgery is a factor.[85]

---

[77] Def.'s Ex. C (Dilks Dep.) 6:16.

[78] *Id.* 9-10.

[79] *Id.* 27:4-6.

[80] *Id.* 35:8-12.

[81] *Id.* 38:9-39:23.

[82] *Id.* 40:20-41:13. Dr. Dilks stated that environmental triggers could push a bipolar downward cycle to occur faster, but could not by itself trigger a bipolar experience. *Id.*

[83] *Id.* 41:8-16.

[84] *Id.* 46:5-15.

[85] *Id.* 51:1-14.

### E.) Dr. Bride

Dr. Francis Bride testified via deposition that he could have treated Ms. Vezina's irritable bowel syndrome[86] to some extent through medication and diet.[87] After a September 2004 appointment with Dr. Bride, Ms. Vezina never returned to explore treatment options.[88]

### CONCLUSIONS OF LAW

Linda Vezina alleges that the United States, through its employee Dr. Austin, was negligent and failed to meet the appropriate standard of care before, during, and after her diagnostic laparoscopic surgery on March 10, 2004. She alleges that Dr. Austin's negligence has resulted in severe complications that persist today, and will continue throughout her lifetime, including:

> a. Perforated sigmoid colon
>
> b. Acute peritonitis
>
> c. Intra-abdominal hemorrhage of 750cc +/-
>
> d. SIRS and Sepsis
>
> e. ARDS with Respiratory Failure requiring prolonged ventilator support
>
> f. Two open abdominal surgeries to repair injuries & clean infection
>
> g. Diverted bowel evacuation via ileostomy
>
> h. Prolonged abdominal wound healing by second intent
>
> i. Third abdominal surgery to reverse ileostomy and revise abdominal

---

[86] Ms. Vezina has irritable bowel syndrome predating her surgery. Irritable bowel syndrome can cause chronic diarrhea. Def.'s Ex. A (Bride Dep.) 12:12-20, 17:2-10, 19:13-16.

[87] *Id.* 18:16-20.

[88] *Id.* 19:3-12.

16

wound

j. Small bowel resection with resultant reduction in nutrient absorption

k. Bronchoscopic procedure with lavage to evaluate extent of damage to lungs

l. Multiple blood transfusions

m. Urinary tract infections

n. Irritable bowel syndrome with cramping, diarrhea, and constipation

o. Abdominal incisional hernias

p. Fourth abdominal surgery to repair the incisional hernias (Total of four additional general anesthesia events Plus sedation for bronchoscopy procedure)

q. Cholelithiasis

r. Depression

s. Aggravation of Bi-Polar Disorder

Kayla Vezina alleges that she suffered the loss of consortium of her mother.

### A.) Jurisdiction

Jurisdiction arises pursuant to the FTCA, 28 U.S.C. § 2671 *et seq.*, and 28 U.S.C. § 1332(b). "Under the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances." *Kennedy v. United States*, 750 F. Supp. 206, 210 (W.D. La. 1990). "The appropriate law to follow in determining liability under the FTCA is the law of Louisiana, where the negligent act is alleged to have occurred." *Id.*

## B.) Applicable Law

In a malpractice action pursuant to La. Rev. Stat. Ann. § 40:1261 *et seq.*, the plaintiff shall have the burden of proving:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

La. Rev. Stat. Ann. § 9:2794.

## C.) Conclusions of Law

This case required the Court to determine the credibility of expert testimony. "In a medical malpractice action, the assessment of factual conflicts, including those involving the contradictory testimony of expert witnesses, lies within the province of the trier of fact." *Hubbard v. State*, 02-1654 (La. App. 4 Cir. 8/13/03); 852 So.2d 1097, 1103. Having carefully considered all of the evidence presented, this Court finds that the Government did not conform to the applicable standard of care with respect to Linda Vezina's March 10, 2004 surgery. Based upon the aforementioned findings of fact and the applicable law, this Court finds that Linda Vezina has met her burden of proving it is more likely than not that the United States, through its employee Dr. Austin, failed to

conform to the appropriate standard of care.

As discussed above, this Court does not find Dr. Austin or Dr. Fernandez to be credible. This Court concludes that the plaintiff's expert witness, Dr. Piver, is credible. Accordingly, consistent with Dr. Piver's testimony, this Court finds that Dr. Austin committed several independent breaches of his standard of care while performing Ms. Vezina's March 10, 2004 surgery and providing her subsequent post-operative care.

As Dr. Piver testified, if Dr. Austin was concerned about a perforation, as indicated in his transcribed operative note, he should have brought in a consultation, and if one was not available, perform a laparotomy. Further, once Dr. Austin encountered the large band of bowel attached to the anterior abdominal wall, he should have removed all of the gas used in the beginning of the procedure to expand the abdominal wall, injected between fifteen and twenty liters of saline to wash out the pelvis, and checked for blood.[89] Dr. Austin's notes indicate he only used two liters of saline, which Dr. Piver found insufficient.[90] Accordingly, this Court finds that Dr. Austin breached his duty of care by: persisting with a closed laparoscopy when the extensive adhesions on the abdominal wall and the bowel were visualized; failing to convert to an open procedure or laparotomy once the extent of the adhesions was recognized; using blunt dissection during the laparoscopy; and failing to test for bowel perforation at the end of the surgery.

Dr. Austin was also negligent in his post-operative care of Ms. Vezina while she remained in the hospital. Dr. Austin stated that if Ms. Vezina's pulse went above 100, he would be concerned,

---

[89] Piver Dep. 46:2-12.

[90] Id. 46:9-12.

19

yet her pulse was above 100 for several hours prior to discharge, and was 117 at the time of discharge. Dr. Austin testified at trial that he was not aware that Ms. Vezina's pulse was elevated at the time of discharge. He testified that she was not a "stable patient," but he discharged her without an AMA[91] notation in her file. The record is replete with examples such as this one, and these examples demonstrate that Dr. Austin failed to pay adequate attention to Ms. Vezina's vital signs and overall condition following surgery.

Moreover, Dr. Austin breached his standard of care in responding to Ms. Vezina's post-discharge phone call, during which she complained of continuing pain. Each expert testified that severe pain following diagnostic laparoscopy is a warning sign for a bowel perforation. Yet, instead of instructing her to come to his office or the nearest emergency room, as Dr. Piver testified would have been appropriate, Dr. Austin instructed Ms. Vezina to take Mylanta and more pain medication. This Court finds that Dr. Austin failed to uphold his standard of care in his response to Ms. Vezina's post-operative phone call.

Finally, this Court finds that Dr. Austin was negligent when he delayed dictation of his notes until March 16, 2004 for a surgery performed March 10, 2004. In those six days, Ms. Vezina underwent two additional surgeries performed by different doctors, and those doctors had to operate on Ms. Vezina without the benefit of Dr. Austin's March 10 surgical notes, or a comprehensive progress note. Dr. Austin's handwritten notes from March 10 were insufficient, and there are two significant discrepancies between the handwritten notes and the dictated March 16 report. The dictated report states that Ms. Vezina was in "guarded" condition, and that she was being kept

---

[91] AMA stands for "against medical advice" and is marked on a patient's file when the patient is discharged against medical advice.

overnight for observation; however, the handwritten note written the day of surgery does not mention either of these items. Thus, the March 14 and March 16 surgeries were performed before Dr. Austin's dictated report was available, and Drs. O'Donnell and Guidry had to operate without the benefit of this information. Moreover, the notes for both the March 14 and March 16 surgeries were typed before Dr. Austin's notes were, and accordingly, Dr. Austin had the benefit of reviewing these records in preparing his March 10 operative report. Therefore, this Court finds several individual breaches in Dr. Austin's standard of care, and any one of these independent breaches constitutes medical malpractice.

Dr. Piver testified that the breach of one or more of these standards of care resulted in damage to Ms. Vezina.[92] This Court accepts Dr. Piver's conclusions on causation, and finds that Dr. Austin's breaches of standards of care proximately caused Ms. Vezina's damages.

At trial, the plaintiffs presented extensive testimony regarding the continued effect the surgery has had on Ms. Vezina. Ms. Vezina testified that from the time she first woke up in ICU, and for some time afterwards, she had a colostomy bag that she was responsible for changing until Dr. O'Donnell performed a reversal colostomy. She testified that it took five months for her wounds to heal. She also testified that she still has uncontrollable gas, diarrhea, and extensive abdominal scarring. Moreover, she stated she "looked terrible," dropped down to 100 pounds, and she wished she would have died in the hospital.

Ms. Vezina testified that she has had accidents on herself. She is employed, but has to run to the restroom frequently. Because of her gas and diarrhea, Ms. Vezina said she has frequent

---

[92] *Id.* 23:5-9.

accidents, must wear pads at all times in case of accidents, and worries about soiling herself every day. She stated that she is now unable to enjoy almost everything that she enjoyed in the past. Ms. Vezina also stated she no longer feels attractive. Ms. Vezina testified that she has been treated by Dr. David Buttross since 2008 and would not feel comfortable leaving his care.

Ms. Vezina's husband, Paul Haverkamp, testified that she is self-conscious of her abdominal scars. He also testified that she is unable to control her gas and diarrhea, which severely impacts her ability to be in public. Mr. Haverkamp testified that they can go to restaurants but must go straight home because Ms. Vezina needs access to a restroom within twenty minutes of eating. Ms. Vezina can no longer go dancing. Mr. Haverkamp also testified that their marital relationship is impacted as a result of the 2004 surgery because Ms. Vezina has soiled the bed sheets and Mr. Haverkamp during intimate moments. Mr. Haverkamp also testified that all of these factors negatively impact his wife's self-esteem and make her feel unattractive.

Ms. Vezina's daughter, Kayla Vezina, also testified at trial. Ms. Vezina's surgery was performed when Kayla was 13, and for the eight days her mother was in intensive care, and even afterwards, Kayla did not know whether her mother would survive. Kayla also testified that her mother has social anxiety from her gas and diarrhea. Kayla and her mother used to enjoy swimming, tanning, and shopping, which they no longer enjoy together on a regular basis. Kayla also testified that her mother's medical problems have forced her to grow up quickly and assume the role of the parent. This Court finds Kayla Vezina's testimony credible.

### D.) Damages

Having concluded that Dr. Austin breached his duty of care and his breach caused Ms.

22

Vezina and Kayla Vezina damages, this Court now turns to appropriate compensation for these injuries.

### A.) Past Medical Expenses

The Medicaid program has paid many of Ms. Vezina's medical expenses, and DHH entered into a stipulation with the United States and Ms. Vezina that it is owed $44,073.12 out of any Judgment Ms. Vezina may receive. Accordingly, the United States shall pay DHH $44,073.12 in past medical expenses incurred on Ms. Vezina's behalf.[93]

### B.) Future Medical Expenses

"Future medical expenses must be established with some degree of certainty. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost." *Duncan v. Kansas City S. Ry. Co.*, 00-0066 (La. 10/30/00); 773 So.2d 670, 684.

The Government argues that Ms. Vezina's bipolar disorder existed prior to surgery, and that the surgery was only a component in aggravating her bipolar disorder. The Government offers Dr. Dilks' testimony to demonstrate that Ms. Vezina suffered from bipolar disorder before her surgery, that bipolar disorder is genetic, and that the surgery did not trigger her bipolar disorder. By Dr. Dilks' own admission, the insurance provider did not permit him to delve into the triggers of Ms. Vezina's depressive episodes, which are part of her bipolar disorder. Dr. Buttross, who was able to explore Ms. Vezina's triggers, testified at trial that he believed her surgery was the main trigger of her bipolar disorder and her social anxiety. This Court accepts Dr. Buttross' conclusion, and finds that the surgery is the main factor that has made her more prone to depressive episodes associated

---

[93] Stipulation [doc. 61].

with her bipolar disorder and social anxiety.

Accordingly, Ms. Vezina shall receive $116,980 for twenty years of future medical care. The Court finds that Ms. Vezina established her future medical expenses with certainty, based upon Dr. Buttross' testimony of her future care plan. He testified that treatment for someone with bipolar disorder is ongoing, and accordingly, this Court awards twenty years of future treatment. This Court awards quantum based upon Ms. Vezina's exhibits outlining the cost of such care in the past. Specifically, this includes: seeing Dr. Dilks twice per month at $125 per session ($3,000 per year); seeing Dr. Buttross once per month at $90 per session ($1,080 per year); prescription medication totaling $105 per month ($1,260 per year); and twice yearly lab work to monitor her dosages, which is $254.50 per lab session ($509 per year).[94]

### C.) General Damages

"General damages are those which may not be fixed with pecuniary exactitude; instead, they 'involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.'" *Duncan*, 773 So.2d at 682 (quoting *Keeth v. Dept. of Pub. Safety & Transp.*, 618 So.2d 1154, 1160 (La. App. 2 Cir. 1993)). To compensate Ms. Vezina for her pain and suffering and loss of enjoyment of life, this Court awards $1 million.

An injured party has a duty to take reasonable steps to mitigate her damages. *Aisole v. Dean*, 574 So.2d 1248, 1253 (La. 1991). The Government argues that Ms. Vezina did not mitigate her damages because she failed to pursue treatment with Dr. Bride, who stated in deposition that Ms. Vezina's irritable bowel syndrome was treatable. This Court accepts Dr. Bride's testimony that Ms.

---

[94] Pl.'s Ex. 13.

Vezina could have improved her irritable bowel syndrome at least somewhat by pursuing treatment with him. Furthermore, it is uncontested that Ms. Vezina seeks damages for the aggravation of her bipolar disorder. Accordingly, Ms. Vezina's general damage award is reduced by 20%. Her general damages award is further reduced to $500,000, as required by the Louisiana Medical Malpractice Act (hereinafter "MMA") La. Rev. Stat. Ann. § 40:1299.42 (B)(1).[95]

### D) Kayla Vezina's Damages

To compensate Kayla Vezina for the loss of consortium of her mother, this Court awards Kayla Vezina $100,000.

### E) Prejudgment Interest

Pursuant to 28 U.S.C. § 2674, the United States shall not be liable for interest prior to the judgment. 28 U.S.C. § 2674; *see also Lucas v. United States*, 807 F.2d 414, 423 (5th Cir. 1986). Accordingly, no prejudgment interest shall be awarded.

---

[95] The Fifth Circuit has held that although the United States is not a "health care provider" as defined under the MMA, the $500,000 cap nonetheless applies to the Government because the Government is in "like circumstances" as private health care providers. *Owen v. United States*, 935 F.2d 734,737-38 (5th Cir. 1991). Pursuant to the La. Rev. Stat. Ann. 40:1299.42 (B)(1), "[t]he total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost."

## CONCLUSION

IT IS ORDERED that, based on the findings of fact and conclusions of law stated in this

Opinion, this Court finds in favor of the plaintiffs and against the United States.

Lake Charles, Louisiana, this ____27____ day of May, 2009.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE